UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 25-62612-CIV-DAMIAN

BENJAMIN C. OLSEN,

       Plaintiff,

vs.

U.S. DEPARTMENT OF INTERIOR,

       Defendant.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Benjamin C. Olsen, hereby responds to Defendant's Cross-Motion for Summary Judgment (ECF No. 12) and replies to Defendant's Response to Plaintiff's Motion for Summary Judgment (ECF No. 12). A Second Affidavit of Plaintiff ("Second Olsen Affidavit") is filed herewith.  Plaintiff's initial Affidavit (ECF No. 8-1) shall continue to be referred to as "Olsen Affidavit". Plaintiff relies on the entirety of each affidavit.

Plaintiff does have a compelling need for the requested documents. Plaintiff is a person primarily engaged in disseminating information with an urgency to inform the public concerning an actual Federal Government activity: WERP. [Second Olsen Affidavit at ¶3.]

At all times relevant to this action, Plaintiff has operated as a citizen journalist Plaintiff has spent more than 3000 hours, unpaid, investigating and reporting on WERP with a focus on Region 2 of WERP. Plaintiff has also, in the relevant time, spent well beyond those 3000 plus hours advocating for transparency and public engagement with regard to both WERP and the broader Everglades restoration projects. The thousands of hours of unpaid time, specific to WERP, that Plaintiff has worked to advocate for the

1

environment and inform the public, as well as elected and appointed government officials, represents a major portion of Plaintiff's available work hours. With advocacy, public outreach, and information dissemination for the Everglades broadly, this amount of time is well past the majority of Plaintiff's available work hours since he was inspired, in August of 2022, to make a positive difference. What had started as a desire to stop the flooding of his own land rapidly evolved into Plaintiff finding a true passion to protect the environment at large and endangered species habitat by informing the public on what is wrong or misleading regarding Everglades Restoration projects. [Second Olsen Affidavit at ¶¶4-7, and see ¶¶8-13 for particulars.]

The Estenoz Request and the Ramos Request do not concern insignificant matters. [See Second Olsen Affidavit at ¶¶14-15 for particulars.]

WERP is not simply an "Army Corps of Engineers environmental project" as described by Defendant, it is overseen by the "Everglades Taskforce" which included Estenoz and includes Ramos. [See Second Olsen Affidavit at ¶16 for particulars.]

Region 2 is a very significant part of WERP and includes primary Panther breeding grounds which will be flooded out, as shown by the WERP water flow modeling. Florida and the Federal government have, combined, spent hundreds of millions of dollars to protect the endangered Florida Panther and its habitat. The sad irony is palpable: the state and federal governments have spent enormous sums of money to protect the Panthers, only to wipe them out with a terrible plan. It is commonly known that there is great public interest in efforts to protect the Everglades and the endangered Florida panther. (E.g., "Save the Everglades." "Save the Florida panther.")  [See Second Olsen Affidavit at ¶¶17-22 for particulars.]

There is an urgency to inform the public about this actual Federal Government activity. The documents requested clearly have "particular value" that will be lost upon WERP Region 2 construction.

All of the records requested via the Estenoz and Ramos Requests are critical to understanding WHY the original WERP plan, which was workable and effective to <u>restore</u> the Western Everglades, was changed by USACE to the WERP plan that was enacted by WRDA 24, which will instead serve to <u>destroy</u> huge swaths of the Western Everglades. Defendant incorrectly asserts that records as far back as 2016 are not relevant ongoing construction designs or implementation. Plaintiff notes that information he has already uncovered from other sources, and disseminated, has been of great assistance to the public in understanding what occurred before the Private Landowners did come into the process. Documents obtained via FOIA from the USACE were reviewed, summarized, and disseminated to the public by Plaintiff which led in part to SFWMD, the State sponsor of WERP, rejecting the federal WERP Region 2 plan in favor of a state funded alternative.[1] [See Second Olsen Affidavit at ¶¶23-25 for particulars.]

The fact that the estimated page counts for the Estenoz and Ramos Requests collectively exceed the page counts of the USACE staffers themselves shows just how involved both Ramos and Estenoz were and are in WERPs design, alteration and implementation. Their records will be critical in understanding why the USACE so greatly deviated from the initial 2016 plan - the plan which SFWMD is now largely attempting to

---

[1] There is a concern that the State funded redesign will not have the funding required leading Plaintiff to continue to focus on the Federally Authorized plan. [Olsen Affidavit at ¶33.]

3

revert to for Region 2. No reason has yet been explained to the public by USACE, Estenoz or Ramos as to why the 2016 plan was so heavily altered. [Second Olsen Affidavit at ¶26.]

Estenoz admitted to pushing authorization of the federal WERP plan to the Assistant Secretary of the Army for Civil Works. Throughout the WERP process, she has moved back and forth between Government positions (Head of the OGIS and Assistant Secretary of the Interior) and the Everglades Foundation, a nonprofit which heavily supported WERP, during Estenoz's Employment as Assistant Secretary. Ramos regularly engaged with staff of USACE, other supporting government agencies, the Seminole Tribe, and the Miccosukee Tribe regarding WERP design. Both Estenoz and Ramos were involved in early modifications to WERP design, working together as early as 2017. [See Second Olsen Affidavit at ¶¶27-29 for particulars.]

Plaintiff is entitled to expedited processing, as he has requested, because Plaintiff has shown that he has a compelling need for the government records at issue. Plaintiff is primarily engaged in disseminating information specific to WERP; that the value of these records will be diminished if they are not promptly produced; and that there is an urgency to inform the public concerning an actual Federal Government activity related to WERP. Moreover, Plaintiff's requested rates of processing are practicable as Defendant has not represented its capacity in good faith, nor has Defendant established "exceptional circumstances" to delay production.

If expedited processing is warranted, the agency shall process the request as soon as practicable. In opposing a plaintiff's motion to expedite the processing rate, the agency bears the burden of presenting credible evidence that disclosure within such time period, requested by the plaintiff, is truly not practicable. Courts consider, for example, evidence

of the agency's resource constraints, obligations to other FOIA requests, whether the request implicates sensitive or confidential materials, and whether there is evidence that the agency is not representing its capacity in good faith. <u>Documented NY v. United States Department of State</u>, 2021 WL 4226239 at *2 (S.D. New York September 16, 2021); and see 5 USC 552(a)(6)(E)(iii).

5 U.S.C. 552 (a)(6)(C) states:

> (i) "If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records."

> (ii) "For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable <u>progress</u> in reducing its backlog of pending requests." (Emphasis added.)

In <u>La Nica Products Inc. v. Internal Revenue Service</u>, 2026 WL 1430489 at *1-2 (S.D. Fla. May 6, 2026), the cause was before the Court upon the parties' competing proposed schedules for IRS to produce documents pursuant to a FOIA request. The IRS argued that, given its current caseload and staffing challenges, it could process and produce only 500 pages per month of the identified 40,500 pages. The Southern District found Defendant's proposal to be unreasonable. It would take a period of more than seven years before the responsive records are produced, which contravened the FOIA requirement that the request be processed "as soon as practicable". The Court noted that the defendant's case law mostly related to the exceptional circumstances occurring during the Covid-19 pandemic and said that this was no longer applicable.

<u>La Nica</u> noted that Defendant's default position also ignored or hid other important facts such as the amount of time that had already elapsed since the initial request was

made; the ability to increase or shift staff for these purposes; and the existence and improvement of technology to assist in the performance of such tasks. The Court also noted that the Defendant had put forward nothing that would suggest that the sensitivity, difficulty, or nature of the review and production should be done at a rate that takes more than seven years. The Court stated that IRS did not come close to establishing that there was anything about the review and production that called for extraordinary time. La Nica closed with the following:

> This is the United States of America, and the public servants who staff our federal government perform impressive tasks week-in, week-out, with professionalism and dispatch. A government agency at some point must hire the appropriate staff and obtain the tools necessary to perform basic requests for production that are required by Congress…If a government agency is allowed to claim that processing documents for a garden-variety FOIA suit simply cannot be done for more than seven years due to staffing constraints, federal litigation goes through the looking glass.

In Korf v. United States Department of State, 2025 WL 2256143 (S.D. Fla. August 7, 2025), the Department of State sought a stay of the FOIA action pending defendant's completion of its processing of the FOIA request.  The plaintiff had sued on February 21, 2025, asserting that the defendant had failed to comply with FOIA's requirements by its failure to conduct an adequate search, failure to respond to the request within statutory timeframe, and failure to disclose non-exempt records. [ *1] Defendant said that it would try to process material at a rate of 450 pages per six weeks. [*1] Plaintiff noted that defendant had failed to produce a single document over a period of two-and-a-half years. [*2] Plaintiffs highlight that, despite identifying approximately 80,000 potentially responsive pages, defendant only began searches after plaintiff filed suit in 2025 – 28 months after receiving the request. [*2] The Court stated that exceptional circumstances

6

must be genuinely unforeseen and remarkable [*4] and that, "Simply having a high number of FOIA requests or a large backlog is inadequate to establish exceptional circumstances…A predictable volume of requests can only serve as an exceptional circumstance if Defendant can show reasonable progress in reducing its backlog of requests." (Emphasis added.) [*4] Courts in this District have held that responding to requests on a first-come, first-served basis satisfies the due diligence requirement unless the plaintiff has some exceptional or urgent need for the information. [*5] Korf found that the Department of State had failed to provide processing records to demonstrate that it is actually following its claimed first-come, first-served policy and, accordingly, had not shown due diligence. [*5]

In Gyetvay v. United States Department of Justice, 2024 WL 2740336 (M.D. Fla. April 23, 2024), the Court noted that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances. [*1] Instead, an agency must show that the number of requests received in the relevant period was truly unforeseen and remarkable. [*1] The primary issue Gyetvay appeared to the Court to be a lack of staffing, "…however, the Tax Division's failure to hire enough staff to review incoming FOIA requests is not an exceptional circumstance justifying more time. It is a self-inflicted handicap." [*2] The Court determined that the Tax Division's assertion of a high number of FOIA requests and a backlog of requests were not shown to be truly unforeseen and remarkable and therefore did not constitute exceptional circumstances. [*2] The Court noted that the Tax Division had said it responds to requests on a *first come, first served basis*, which generally satisfies the "due diligence" requirement. However, the processing report showed the Tax Division had resolved eighty-five of the 136 FOIA requests filed

after Gyetvay's and if the Tax Division were proceeding on a first-in, first-out basis, those requests should have been addressed after Gyetvay's.

With regard to the Estenoz FOIA Request, Defendant is not representing its capacity in good faith. Plaintiff seeks an increase to 1,550 pages processed per month.

As shown in the Estenoz acknowledgement letter, this request was placed on the Normal Track. As shown on the Office of the Secretary December 2023 FOIA Log, the Estenoz FOIA request has two different designations: simple and normal. [Second Olsen Affidavit at ¶30.]  Whether "Simple" or "Normal", Defendant should have begun promptly producing as the acknowledgement letter suggested it would. This request was never listed as "complex" and no request to extend the standard time to begin production was made. However, Defendant took 28 months from sending the acknowledgment to begin production. This production only came about because of the filing of this action.

Since production began, Defendant has asserted that, for Estenoz, it cannot process more than 500 pages per month. Every monthly production has surpassed this rate. Each month, the letter accompanying the rolling production lists the number of pages processed. One month surpassed 1000 pages; the least amount processed in a month was 802 pages [Second Olsen Affidavit at ¶31]. With a total of 23,000 potentially responsive records, at the lowest rate processed thus far, Defendant would complete production next month had they begun processing within 30 workdays as the acknowledgment letter indicated. Instead, Defendant chose to ignore the Estenoz Request for more than two years and may not now fairly request that the Court allow the Defendant additional time to complete its processing and production of the records. Defendant did not exercise due diligence in responding to this request as evidenced by

8

the 25 month period of time from Defendant's acknowledgment letter to Defendant's counsel's letter of January 21, 2026.

In addition to not exercising due diligence prior to the filing of Plaintiff's Complaint, Defendant has not asserted or established exceptional circumstances which would allow for additional time to complete and produce the requested records. Defendant merely points to the backlog of cases which is, according to the Fairman Declaration, increasing year over year [Fairman Declaration at ¶ 23]. While Fairman does not specify the position of the Estenoz Request in their backlog, she claims that the OS operates on a "first-in, first-out" basis for each request track [Fairman Declaration at ¶ 23]. Fairman further states that OS has a current case load of 866 pending cases with 767 requests being received in 2026 to the date of the Declaration. A simple analysis of this information leads to the conclusion that (roughly) 99 pending cases remaining in the backlog come from 2025 or before assuming "first-in, first-out" was "generally followed" by OS. Even assuming Plaintiff's request was the last request filed in 2023 for argument's sake, this would imply that OS has completed 2,818 FOIA requests prior to completing the Estenoz Request.[2] To further the point, the overwhelming majority of those 2,818 requests would have been processed and completed prior to Plaintiff having received the first record from Defendant, despite it being a normal or simple track request. Defendant has not been representing its capacity in good faith with respect to the backlog of cases or its processing on a "first-in first-out" basis. Defendant only points to backlog which it admits has not been reduced

---

[2]    In 2024, OS received 1,187 incoming requests. In 2025, OS received 1,631 incoming requests [Fairman Declaration at ¶ 36] adding these numbers together and subtracting 99, the difference between current caseload and cases received in 2026 provides the completed number.

[Fairman Declaration at ¶ 36]. At no point did Defendant cite "unforeseen and remarkable" circumstances; it simply relied on backlog.

According to the Banco Declaration, NPS's purported standard rate of production is only 250 pages per month largely due to only having one employee for FOIA requests in the Southeast NPS office. [Banco Declaration at ¶33]. Plaintiff seeks to increase this rate to 3,400 pages per month, which Plaintiff acknowledges is a significant increase. However, Plaintiff points to Defendant's bad faith actions shown by his Affidavits together with the Banco Declaration, Defendant's misrepresentation of its capacity, and the timeline of the "actual Federal Government activity" to justify such an increase.

Initially, the acknowledgement letter for the Ramos Request listed it as a "complex" FOIA request and cited a total of 101 pending requests ahead of it. [Olsen Affidavit at Exhibit D] The Ramos Request was given a production completion estimate of "June 2025" in the acknowledgment letter. Plaintiff had requested expedited processing and was denied despite Plaintiff having noted WERP's federal authorization timeline. Shortly thereafter, Plaintiff submitted the first appeal to this production completion estimate further explaining that, at Defendant's then 18-month timeline, the Request's "completion" would be far past the actual Federal Government activity's authorization. Defendant failed to respond within 20 workdays as required by FOIA, instead opting to deny the appeal on workday 21 because Plaintiff had not included all correspondence with Defendant. Plaintiff immediately appealed again, with all correspondence attached, and was again denied 77 workdays later (57 workdays beyond statutory limit).

The Banco Declaration did not mention the first appeal denial, that both appeals were not responded to within statutory time limits, or that Defendant had ignored its

completion date of June 2025 despite Plaintiff's repeated attempts to follow up with Defendant about the Request. Instead, Defendant emphasizes that initial responsive records were collected by Defendant on August 21, 2024 [Banco Declaration at ¶11] and that a subsequent search for all secondary terms in the Ramos Request was conducted in a 24-hour period some 13 months later completed on September 16, 2025 [Banco Declaration at ¶12]. Defendant acknowledges records were collected and ready for processing, but does not explain why processing was never started, why the completion date of "June 2025" was not adhered to, why the secondary search took only 24 hours nearly 13 months after the initial search, or why Plaintiff was never informed of the searches prior to the filing of the Banco Declaration. On September 25, 2025, Plaintiff gave a speech at the Everglades Taskforce Working Group/Science Coordination Group meeting. Ramos was in attendance and Plaintiff addressed him directly. Plaintiff described how the records for this FOIA were being withheld and his need to sue. All documents were in NPS's possession at the time [Second Olsen Affidavit at ¶11]

As with the Estenoz Request, Defendant did not exercise due diligence in responding to the Ramos Request. However, while Defendant may be exercising due diligence with Estenoz, subsequent to the filing of the lawsuit, the same cannot be said with regard to Ramos. In the March 2026 production, despite having insisted on a 250 page per month production rate, Defendant only processed 246 pages. [Banco Declaration at ¶12.] In the three Ramos productions thus far, Defendant has released numerous publicly available PowerPoints and congressional reports that the FOIA employee would understand require no review for redaction [Second Olsen Affidavit at ¶32]. Plaintiff is not critical of the fact that these documents were included in the releases,

he merely points out the fact that these documents would not require strict scrutiny and should allow Defendant to produce far more than the 250 page rate. WERP is an Everglades Restoration project, not a matter of National Security or criminal activity which were the subjects of numerous cases cited by Defendant [Second Olsen Affidavit at ¶33]

Further, the Ramos Request March production contained a redaction of a 2019 memo that Plaintiff knows to have been made in bad faith [Second Olsen Affidavit at Exhibit M, Q, and R]. Plaintiff will not seek Court review of this redaction because the document has been publicly available for 7 years. This memo was redacted in a separate manner in two separate FOIA releases 24 hours apart. The release of this memo, unredacted, would do no harm to Defendant at this point. This document was specific to a joint NPS-USACE request for solicitor instruction on how the federal government could get around the Federal charter for the Big Cypress National Preserve to condemn privately owned lands so that WERP could progress. It was addressed to Pedro Ramos. It was leaked to the public in 2019 by an unknown federal employee [Second Olsen Affidavit at ¶34]. Defendant claimed that this document was partially redacted under attorney-client privilege. But Ramos himself regularly has referred to the contents of this document both in public meetings and in meetings with the Tribal nations involved with WERP. [Second Olsen Affidavit at ¶28]

Additionally, in a FOIA request for Shannon Goessling, the signing Regional Solicitor for the 2019 memo, the memo itself was fully redacted, rather than partially, under attorney-client privilege. As shown in the March 2022 FOIA Memorandum by then Attorney General Merric Garland, "Information that might technically fall within an exemption should not be withheld from a FOIA requester unless the agency can identify

12

a foreseeable harm or legal bar to disclosure. In case of doubt, openness should prevail"
[Second Olsen Affidavit at ¶35] Throughout this FOIA request, Defendant has operated without due diligence and in bad faith by ignoring production times and by wasting time and effort redacting publicly available documents in an arbitrary and capricious manner.

Just as with the Estenoz Request, Defendant does not assert or establish any exceptional circumstances. Once more, Defendant points to backlog and staff shortages as the justification for a 17-year production rate, in addition to the more than two years wasted before Defendant began to produce records in response to the Ramos Request.

Defendant claims that the NPS Southeast FOIA office has 95 pending FOIA cases currently. [Banco Declaration at ¶45]. The FOIA office has received at least 394 requests since Plaintiff filed the Ramos Request [Banco Declaration at ¶45]. The Declaration claims that NPS uses a first-in, first-out basis for these requests. However, when considering the acknowledgment letter, it is clear that first-in, first-out was not followed. There were 101 pending cases at the time of Plaintiff's acknowledgement letter. Presumably, roughly 400 FOIA requests were processed in the timeframe that Plaintiff received a meager 837 pages.[3]

Defendant does not show, in the Banco Declaration or the Fairman Declaration, that NPS or OS has made any progress in reducing backlog or that any increase in the number of requests was "unforeseen or remarkable"; rather, the declarations focus on staffing limitations which is not a valid ground to establish exceptional circumstances.

---

[3]      When Plaintiff filed the Ramos Request, there were 101 pending cases in 2023. There are 95 currently for a difference of 6. Considering that there were 394 requests since Plaintiff filed his request, this would imply 400 have been processed since Plaintiff filed the Ramos Request.]

For both OS and NPS, their lack of capacity to process the predictable and foreseeable amount of FOIA requests stems from a lack of staffing rather than any wrongdoing by the requestors or any exceptional circumstances. As in Gyetvay, Defendant here has instituted a self-inflicted handicap.

Defendant argues that Plaintiff rejected or ignored several proposals from DOI that he narrow his request or prioritize topics or search terms. Plaintiff initially declined and explained the importance of receiving all responsive documents. Defendant then recommended that Plaintiff give an offer to refine nonetheless and plaintiff explained that his concern was no movement by Defendant on the production rate. Plaintiff offered to negotiate on Production rate if Defendant would concede on specific items such as producing in order by date, not objecting to judicial review if needed, and extending the request dates out as there had been significant delay. Defendant refused Plaintiff's offer and continued to insist upon Defendant's "standard production rate".  Defendant asked if Plaintiff had any topics he wanted to prioritize. Plaintiff again insisted all topics hold priority and again objected to Defendant's production rate. [Second Olsen Affidavit at ¶36.]

Defendant's claim that Plaintiff would be contributing to the delay in production should be considered unpersuasive by the Court because Defendant only requested narrowing after the filing of this lawsuit. [See Korf, supra at *6.]

Plaintiff is seeking an increase in production for the Estenoz Request from 802 pages per month, the minimum rate OS has processed thus far, to 1,550 pages processed per month, an increase of only 1.9 times the current rate which Plaintiff believes is more than reasonable considering the timeline of the "actual Federal Government activity". This would amount to roughly 15 months to process and produce all nonexempt documents to

14

ensure that the value of the requested material is not lost due to delay beyond the actual Federal Government activity.

Plaintiff is seeking an increase in production for the Ramos Request from 250 pages per month to 3,400 pages. NPS originally estimated 18 months to complete the Ramos FOIA Request. Plaintiff is requesting what would amount to 15 months to ensure that the value of the requested material is not lost due to delay beyond the commencement of the construction of the project, the actual Federal Government activity. Considering the extreme delay, lack of support that/showing that Defendant is operating in good faith regarding first in first out/due diligence, and a lack of showing of exceptional circumstances, Plaintiff believes that this is more than reasonable.

Defendant argues that Plaintiff's request for a ruling of entitlement to fees is procedurally improper, citing S.D. Fla. Local Rule 7.3. Plaintiff will not contest Defendant's argument and withdraws his request for a ruling of his entitlement to fees from his Motion for Summary Judgment. Plaintiff will file a motion for fees and costs at a later date.

Plaintiff respectfully requests that the Court Deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion for Summary Judgment, directing Defendant to process the Requests at the rates he has requested.

Date:  June 3, 2026    Respectfully submitted,

MORGAN, OLSEN & OLSEN, LLP
Attorneys for Plaintiff
633 S. Federal Highway, Suite 400A
Fort Lauderdale, FL  33301
Phone: (954) 524-311/Fax: (954) 463-3570
Email:  golsen@morganolsen.com

/s/ Gregory G. Olsen
GREGORY G. OLSEN, ESQUIRE
F.B.N. 247251